UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

In re:

553 WEST 174TH LLC, <u>et</u> <u>al</u>.                                      **Chapter 11**

                                                                    **Case No. 11-14968 (SHL)**



                              Debtor.
--------------------------------------------------------x
BRYAN BINDER and 553 WEST 174TH ST. LLC,

                              Plaintiffs,

       -against-                                                    **Adv. Pro. No. 12-01054**


SE OPPORTUNITY FUND LP, SETH MILLER
SEYMOUR HURWITZ and STEVEN ETKIND,

                              Defendants.
--------------------------------------------------------x


### MEMORANDUM OF LAW IN SUPPORT OF BRYAN BINDER'S MOTION FOR SUMMARY JUDGMENT

<u>PRELIMINARY STATEMENT</u>

       Bryan Binder ("Binder") respectfully submits this memorandum of law in support of his

motion for an order granting him summary judgment and directing debtor, SE Opportunity Fund,

L.P. ("SE") to specifically perform a certain Joint Venture Agreement executed by Binder and

SE on October 8, 2010(the "Joint Venture Agreement.")

       By this motion Binder also asks this Court to conduct an inquest to determine the

monetary damages which Binder has suffered by reason of SE's refusal to consummate the

transaction contemplated by the Joint Venture Agreement in a timely manner.  Binder asks that

1

any monetary damages assessed by this Court against SE be set off against the funds due to SE from Binder in connection with the performance of the Joint Venture Agreement.

A review of the deposition testimony of the parties and the documentary evidence reveals a disagreement in some of the details surrounding the events which led up to this litigation. However, Binder is entitled to summary relief because none of the varying accounts provided by the parties have a material bearing on the ultimate issue to be decided by this Court with respect to the within motion. With respect to that issue, the issue of who defaulted under the Joint Venture Agreement, the facts cannot be disputed. It is clear that SE and not Binder defaulted under the Joint Venture Agreement.

It is undisputed that Binder appeared in the offices of SE's attorney on November 1, 2010, the date set in the Joint Venture Agreement for closing, at approximately 4:30 in the afternoon. It is undisputed that he had in his possession the necessary funds to pay all his obligations under the Joint Venture Agreement. It is undisputed that SE, in the person of Seth Miller ("Miller"), was not available to close.

It is undisputed, as well, that under the contract which an entity controlled by Miller signed to purchase a certain brownstone, Miller had an absolute legal right to adjourn the closing of that contract. It is undisputed that Binder's attorney made several requests of Miller's attorneys to adjourn that closing for a brief period of time. It is undisputed that by the terms of the Joint Venture Agreement, Miller had a legal obligation to, at a minimum, attempt to adjourn the closing. It is undisputed that Miller made no effort whatever in that regard. Instead he declared a default.

2

These are the essential, undisputed facts which entitle Binder to summary judgment as a matter of law.

## STATEMENT OF FACTS

For a full recitation of the complete facts which underlie this litigation we respectfully refer the Court to the affidavits of Bryan Binder and Larry Lazar, Esq., which are part of this submission.   Here we provide an overview, and focus primarily on the undisputed facts which, we submit, mandate the granting of summary relief to Binder.

553 West 174th Street LLC  ("553 LLC") is a New York limited liability company.   In April, 2010, its sole member was SE.   SE, and therefore 553 LLC, was controlled by Miller.

In April, 2010, 553 LLC entered into a contract with Walter Tillow ("Tillow") to purchase a brownstone building (the "Brownstone") located at 120 West 74th Street, New York, New York ("Tillow Contract").  (Exhibit O).  Thereafter, on October 8, 2010,  before the 553 LLC contract with Tillow had closed,  SE executed a Joint Venture Agreement with Bryan Binder. (Exhibit A).  Essentially, by the terms of the Joint Venture Agreement,  Binder was to become the ultimate purchaser of the Brownstone, but, at a price substantially greater than 553 LLC agreed to pay to Tillow. In real estate parlance, Miller, through 553 LLC, was "flipping" the deal to Binder, and realizing a substantial profit on the "flip."

At the signing of the Joint Venture Agreement, Miller provided Binder with a copy of the Tillow Contract.  However, he redacted from the contract the purchase price which 553 LLC was paying Tillow.  Miller obviously did not want Binder to know how much he was paying Tillow.

Discovery documents produced during the course of the litigation revealed that Miller's profit on the "flip" to Binder was approximately $851,750.00.  See purchase prices in Exhibits A and O.

Paragraph 4 of the Joint Venture Agreement gives SE "…the sole authority to control and close the contract…."  In his affidavit submitted herewith, Larry Lazar, Esq.("Lazar"), Binder's attorney with respect to the transaction, states that this provision was consistent with Miller's intent to keep as many of the financial details of the Tillow transaction away from Binder as possible and prevent Binder from receiving any information about the Tillow Contract directly from Tillow. To that end, paragraph 14 of the Joint Venture Agreement provides that "Binder shall have no right to communicate, negotiate or otherwise deal with Seller prior to Closing . . . ." (Exhibit A).

The Joint Venture Agreement contains the following additional provisions which are relevant to this litigation:

a.  SE shall not modify or terminate the Contract of Sale without Binder's prior written consent; and the parties and their respective attorneys shall fully cooperate towards closing and shall keep each other  fully informed.  At the closing, Binder shall fund all monies required to be paid under the paragraph 3, and the Seller shall be paid the amounts due to Seller on the purchase price and any balance due and owing shall be paid to SE. Paragraph 4.

b.  The consummation of this transaction shall take place on November 1, 2010 at the offices of SE's attorney, Seymour I Hurwitz, 19 W. 44th Street, Suite 1507,  New York, New York 10036.  Any closing date after November 1, 2010  which binds 553 shall simultaneously bind Binder to the same extent.  Paragraph 9.

c.  At the Closing, Binder shall make all adjustments and payments required to be made by 553, as Purchaser under the Contract of Sale as though Binder were the original named Purchaser thereunder, including but not limited to any and all title charges of purchaser.  Paragraph 13.

d.  Copies of all material communications sent to or received after the date hereof from Seller, or the attorneys for  Seller, shall be transmitted to the attorney for Binder.  Paragraph 20.

e.  The attorneys for the parties hereto may agree, in writing, to adjournments or modifications of this Agreement.  Paragraph 21.

f.  SE and Binder shall cooperate regarding the exercise of the rights of the Purchaser under the Contract of Sale.  SE shall advise Binder promptly of all notices the SE receives pertaining to the Contract of Sale.  Paragraph 24.

g.  At closing, if Seller shall take back a Note and Purchase Money Mortgage, Binder shall execute and shall cause Susan Binder to execute an Indemnity to Seth Miller indemnifying and holding him harmless under the Note and Mortgage executed to Seller.  Paragraph 31.

Miller has acknowledged being aware at the time of the execution of the Joint Venture Agreement that Binder intended to seek third-party financing.  Indeed, the Tillow Contract of which Binder was the ultimate beneficiary allowed for such financing. (Exhibit O at Paragraph 2 of Amendment dated August 12, 2010.) In their affidavits, both Binder and Lazar state that this issue was specifically discussed during the negotiations of the Joint Venture Agreement.  Given the short window between October 8, 2010, the date of the execution of the Joint Venture Agreement, and November 1, 2010, the closing date in both the Tillow Contract and the Joint Venture Agreement, the parties agreed that if Binder could not secure the needed financing by November 1, the closing would be adjourned.

On October 25, 2010, Miller's attorney, Seymour Hurwitz ("Hurwitz"), sent an e-mail  to Lazar scheduling the closing for November 1, at 10:30 a.m. in his offices.  (Exhibit R.)  As Binder had not yet obtained his financing, upon receipt of this e-mail, Lazar made several attempts to adjourn the closing for a period of between one and two weeks.  Lazar maintains that he received repeated assurances from Miller's attorneys that adjourning the closing would not be a problem.  Miller's attorneys, generally, testified that they had no recollection of ever providing such assurances.  (Exhibit P, at page 67).  Hurwitz did recall a conversation with Lazar in which Lazar requested the adjournment.  Hurwitz testified that after speaking to Lazar he called Miller,

and then communicated to Lazar that Miller would not consent to adjourn the closing. (Exhibit Q, at pages 84-85). On October 28, 2010, Hurwitz reiterated in a letter sent to Lazar that the closing would proceed on November 1. However, unlike the October 25 letter, the October 28 communication does not set a time. (Exhibit X).

Regardless of the respective parties' varying accounts of their conversations on this subject, one thing is beyond dispute. Neither Hurwitz nor Abrams ever contacted Tillow's attorney, William Schaap, to ascertain whether Tillow would be amenable to adjourning the closing beyond the November 1 date. (Exhibit Q, 123-125). As well, Hurwitz did not recall providing Lazar with an explanation as to why Miller was declining to grant the adjournment. (Exhibit Q, 101).

Schaap has submitted a certification filed contemporaneously herewith confirming that neither one of Miller's attorneys ever contacted him to request an adjournment. (Exhibit CC).

Tillow has submitted a certification filed contemporaneously herewith in which he avers that he was amenable to adjourning the closing to any date in the year 2010. (Exhibit DD).

The documentary evidence establishes, as well, that at the same time that Miller's lawyers were telling Lazar that the closing would take place at 10:30 a.m. on November 1, his office was in active and ongoing discussions with Schaap to move the closing to sometime later in the day. (Exhibit T). Ultimately, Schaap and Hurwitz's associate, Mark Abrams, agreed to move the closing to 12 noon on November 1, 2010. (Exhibit CC). For reasons known only to them, neither Abrams nor Hurwitz ever advised Lazar of the change in the time of the closing. (Exhibit Q, 129; Exhibit P, 88).

As well, in the week preceding the scheduled date of the closing, Schaap sent various documents relating to the closing of the Tillow Contract to Hurwitz's office. (Exhibits KK, LL, MM, NN, OO). These included proposed copies of the deed, a note and mortgage to be given by 553 LLC and ultimately to be assumed by Binder, and related affidavits. Schaap also sent calculations with respect to adjustments to be made at the closing.  (Exhibits KK, LL, MM, NN, OO, PP, QQ, RR).

Binder was the ultimate purchaser and he was obligated to pay most, if not all of the charges due from 553 LLC to Tillow at the closing.   Nevertheless, the record is clear that Hurwitz' office shared none of the documents or the calculations with Lazar.

Binder and Lazar remained convinced that Miller had a legal right to adjourn the closing. At a minimum Miller had a legal obligation to make the request of Schaap.  Nevertheless, with the receipt of the October 28, 2010 letter, in which Hurwitz reiterated that the closing would proceed on November 1, 2010, Lazar and Binder determined to avoid a legal dispute and began to take the necessary steps to close on November 1.

On Friday October 29, 2010, at 4:25 p.m. Lazar sent a letter to Hurwitz indicating that and he and Binder would appear on November 1 to close. (Exhibit GG). During the preceding week, Lazar, relying on the assurances of Miller's  attorneys that an adjournment would not be a problem, fully expected that Miller would adjourn the closing.  For this reason, up until October 29, 2010, Lazar did not press forward with the preparations for a November 1 closing on an urgent basis.

Once Lazar realized that Miller was insisting on closing on November 1, 2010 and Binder made the decision to close on that date, a number of open items remained to be

accomplished. In addition, Lazar had not received any information from Hurwitz' office concerning closing adjustments nor had he seen any documents which are generally prepared in advance of a closing.

Under these circumstances, Lazar deemed it prudent to schedule the closing of the Joint Venture Agreement for 4:30 in afternoon on November 1. This would give him additional time to prepare. In addition, he knew that Binder worked as an investor. It would be easier for Binder to attend the closing after the close of the stock market.

The record reflects several communications from Lazar to Hurwitz in anticipation of the closing. He inquired whether Hurwitz could provide to Binder's title company certain of 553 LLC's company documents. (Exhibit HH). Lazar also asked Hurwitz in an e-mail how he wanted to handle the issue of the transfer tax. (Exhibit II). He also asked Hurwitz's office to provide him with copies of the proposed real estate tax transfer forms. (Exhibit JJ). It is undisputed that all of these requests and inquiries went unanswered.

Hurwitz testified at his deposition that when he received Lazar's letter on the afternoon of October 29, 2010, he called Lazar's cell phone. Lazar had provided his cell phone number in the letter which he sent so that parties could communicate over the weekend, if necessary. According to Hurwitz, Lazar did not answer the cell phone. According to Hurwitz, he left a message on Lazar's cell phone in which he advised that the closing was proceeding at 10:00 a.m. or 10:30 a.m. on November 1, 2010 and that Miller would not be available to close at 4:30 on November 1, 2010 because he was hosting a dinner party in his house later that evening. (Exhibit Q, 124-125). At the time of that alleged call, Hurwitz's associate had already sent an e-mail to Tillow's attorney asking that the closing be adjourned to noon. (Exhibit EE).

8

Lazar avers in his affidavit that he did not receive any message from Hurwitz. This is confirmed by telephone records (Exhibit III) which Hurwitz has produced. They show no telephone call to Lazar's cell phone at any time after 4:25 in the afternoon on Friday, October 29, 2010.

Because he had received no communication whatsoever from anyone in Hurwitz' office on Friday, October 29, 2010, Lazar decided to walk over to Hurwitz' offices on Monday morning, November 1. The building security logs reflect that he was signed in by the security desk at 10:05 a.m. (Exhibit SS).

Lazar avers that upon arriving at Hurwitz's offices he asked Mark Abrams to engage in a "pre-closing" in order to smooth the path of the closing of the Joint Venture Agreement later that afternoon. Lazar also declares that Abrams rejected his request.

Abrams testified that he had no recollection of Lazar making that request. (Exhibit P, at page 101). However, Hurwitz testified in his deposition that when he arrived at his office later that afternoon, Abrams reported to him that Lazar had, in fact, come to the office earlier in the day and asked Abrams to engage in a pre-closing. Hurwitz also testified that Abrams reported to him that he rejected Lazar's request. (Exhibit Q, at pages 91-92.)

The parties differ markedly on the events and conversations which took place the rest of that day. However, the following is uncontroverted.

Between approximately 4:15 and 4:30 in the afternoon, Gary Moss, Esq. ("Moss"), Lazar's partner, Binder and his wife joined Lazar at Hurwitz's office. Lazar had left Hurwitz's office after his first encounter with Abrams at 10:00 in the morning. He returned at 2:30 p.m., and remained there until Binder, Binder's wife and Moss arrived. With them was a title closer by

the name of Joel Slomon who worked for First American Title Company, the title company retained by Binder.  Also present was Debra Zinn, a title closer for Madison Abstract which had been retained by Miller to close the Tillow Contract. Zinn had completed closing the Tillow Contract about an hour earlier, and she was still in Hurwitz' offices when the Binders arrived.

Binder displayed for Hurwitz a bank check in the amount of $1,426,750.00 (Exhibit TT). Hurwitz has admitted in his deposition testimony that this amount constituted the full balance which Binder was required to pay to close the Joint Venture Agreement.  (Exhibit Q, at page 36) In addition, Binder had available that day approximately $2,540,000.00 in his bank account, as well as other funds necessary to cover any other closing costs. (Exhibit UU).

Miller was not present.  No one acting on his behalf was prepared to close the Joint Venture Agreement.

At Lazar's urging, Hurwitz placed a telephone call to Miller.  Once again, the versions of the parties as to what occurred after Hurwitz placed the call to Miller differ.  Hurwitz testified that after speaking to Miller, he conditionally agreed to schedule the closing for the following day, November 2, 2010, at 4:30 p.m. The condition was that Miller provide his consent, which, according to Hurwitz he had failed give during the telephone conversation.(Exhibit Q, at pages 38, 39).

According to Lazar and Binder,  Hurwitz's promise to close the following day, after two, and not one, telephone calls to Miller, was unconditional.  Binder's position is buttressed by a number of actions which Hurwitz and Abrams took that afternoon, as well as the following day.

In the interest of expediting matters, the parties agreed to use Miller's title company, Madison Abstract, to close the transaction on the following day.  The record reflects several e-mails from Abrams to Madison Abstract on both November 1, 2010 and the following day, November 2, 2010, unconditionally advising them that the closing was reconvening for the following day and providing them with additional information which was needed to close the Joint Venture Agreement. Abrams also asked Madison Abstract to provide him with certain information related to the upcoming closing.  (Exhibits VV, WW, AAA, BBB).

On the afternoon of November 1, 2010 or the following morning, Hurwitz's office prepared a number of documents which would be needed only if the parties intended to complete the Joint Venture Agreement transaction the next day.  Among these were two indemnity agreements which Binder's wife executed because she would not be available the next day, a "Transfer of Interest" document and document entitled, "Receipt" (Exhibits XX, YY, ZZ, CCC ).

On the morning November 2, 2010,  Miller sent a letter to Lazar via e-mail in which he declared that Binder had defaulted. He nonetheless offered to close if Binder would compensate him for unspecified damages. (Exhibit C). At approximately 3:00 p.m. on that day, SE discharged Seymour Hurwitz as its attorney, allegedly because he had a conflict of interest. (Exhibit EEE).

At 4:30 on the afternoon of November 2, 2010, Binder, Lazar and Moss arrived once again at Hurwitz' offices.  Binder once again had the funds with him from the previous day. Miller was not present to close.  Binder, Lazar and Moss left.

The following day, November 3, 2010, Miller rehired Hurwitz, notwithstanding the alleged conflict. Hurwitz sent an e-mail offering to close. However, Binder had incurred additional expenses for which Miller refused to compensate him. In addition based on his experience to this point, Binder did not believe that Miller would ever the close the Joint Venture Agreement in accordance with its terms. Binder filed a lawsuit.

## POINT  I

### THE STANDARD FOR SUMMARY JUDGMENT

Pursuant to Bankruptcy Rule 7056, which incorporates Rule 56(c) of the Federal Rules of Civil Procedure, the court shall grant summary judgment when the pleadings, evidence obtained through discovery, and affidavits demonstrate that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Lang v. Retirement Living Publishing Co., Inc., 949 F.2d 576 (2nd Cir. 1991).

The Supreme Court has held that the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S.Ct. 2505, 2509-2510, 91 L.Ed.2d 202 (1986). Further, a dispute as to a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 2510.

In determining how a reasonable jury would decide, the "mere possibility that a factual dispute may exist, without more, is not sufficient to overcome a convincing presentation by the other party." Quinn v. Syracuse Model Neighborhood Corp., 613 F.2d 438, 445 (2nd Cir. 1980).

In the case at bar there are disputed facts. However, none of the disputed facts are material to the determination of this motion. Binder submits to that he is entitled summary judgment based only on the undisputed facts.

POINT II

SE, AND NOT BINDER, DEFAULTED UNDER THE JOINT VENTURE AGREEMENT

A. Binder was Ready, Willing and Able to Close on November 1, 2010

A purchaser of real property is entitled to specific performance if he is "ready, willing and able" to perform under the underlying contract by making payment. See Petrello v. White, 412 F. Supp.2d. 215, 230 (E.D.N.Y. 2006) (summary judgment and specific performance granted to purchaser of real property where there was no genuine issue of material fact that it tendered payment.)

Paragraph 9 of the Joint Venture Agreement provides that "…The consummation of this transaction shall take place on November 1, 2010, at the offices of SE's attorney, Seymour I Hurwitz, 10 West 44th Street, Suite 1507, New York, New York 10036…." The Joint Venture Agreement does not set a specific time for the closing.

It is undisputed that Binder appeared at the offices of Seymour Hurwitz at approximately 4:30 in the afternoon of November 1, 2010 ready, willing and able to close the joint venture transaction. Most importantly, he had with him a bank check in the amount $1,426,750.00 which

13

Hurwitz has admitted was the full balance due to SE under the Joint Venture Agreement inclusive of the $2.5 million purchase money mortgage given to Tillow.   In addition, as evidenced by Exhibit UU, Binder had available to him approximately $2,540,000.00 which was more than sufficient to cover any additional closing costs.

Also present that afternoon were Joel Slomon, a representative of First American Title Insurance Company, the title company retained by Binder, and Debra Zinn, a representative of Madison Abstract, the title company retained by SE to close the Tillow transaction.   About an hour earlier, Zinn provided those title services in connection with the closing of the Tillow Contract.

During discovery, SE has questioned whether, in fact, First American Title Insurance Company ever generated a title report for Binder.   It has also cited Binder's failure to produce a title report as a basis for defaulting Binder.   Assuming without conceding for the purposes of this motion alone, that no such report was ever generated by First American, it is clearly the case that Zinn,  whose company had just provided title services in connection with the purchase of the very Brownstone which Binder was ultimately to own, could have easily provided those services for the Joint Venture transaction closing,  as well.   In fact, it is not disputed that on the afternoon of November 1,2010, after Hurwitz spoke to Miller and agreed to adjourn the closing to the following day, allegedly conditioned on Miller's future consent,  both parties agreed that in the interest of smoothing the transaction along, they would use Madison Abstract to close the Joint Venture Agreement.   Correspondence that day and the following day between Hurwitz' office and Madison Abstract further confirms that Madison Abstract could have easily  provided the title services needed to close transaction.   Thus, there were arguably two title companies, not one, which could have provided the necessary title insurance services.

14

However, even if no title company was present that day, this cannot form the basis for a default on Binder's part.  On November 1, 2010, pursuant to the terms of the Joint Venture Agreement, in essence, SE was selling and Binder was buying the Brownstone.  Whatever title insurance services were to be rendered, would be rendered for the benefit of Binder alone, and not SE or Tillow.  SE's sole concern was to collect the funds due it under the Joint Venture Agreement.  As previously established, Binder was in a position to provide those funds.  Whether or not Binder wanted to order a title report or purchase title insurance was exclusively his business.  There is no provision in the Joint Venture Agreement which requires Binder to order a title policy or buy title insurance.  The claim that he did not have a title report available on that day, even if true, did not give SE the right to declare a default.

In summary, Binder was present in Hurwitz's offices on November 1, 2010, the date set in the Joint Venture Agreement, ready to close.  SE was not available to close, and was thus in default of the Joint Venture Agreement.

B.  SE, Not Binder, Is Responsible For The Tillow Contract And Joint Venture Agreement Not Closing Simultaneously

SE may contend that Binder's failure to appear and close at noon, on November 1, the time unilaterally set by Miller for the Tillow Contract closing, constituted a default on Binder's part.  That contention is without any basis.

SE has consistently claimed that the Joint Venture Agreement mandates that the Tillow Contract and the Joint Venture Agreement close simultaneously.    In fact, the parties to the Joint Venture Agreement did contemplate that the Tillow Contract and the Joint Venture Agreement would close simultaneously.  Certainly, that would have been the ideal.  However, as we argue

below, there is much in the Joint Venture Agreement which leads to the conclusion that a simultaneous closing was not one of its legal requirement.

The foregoing notwithstanding, for the purposes of this motion, it is assumed that the Joint Venture Agreement required, as Miller contends, the two deals to close simultaneously. For the purposes of this motion, it is also assumed that SE had the legal right to set the time of the closing.

Even with those assumptions in place, under the circumstances here present, Binder did not default by failing to appear and close at noon on November 1, 2010.

Coupled with its alleged right to set the date and time of the closing, came SE's clear obligation under Paragraph 4 of the Joint Venture Agreement to "…fully cooperate toward closing…" and Paragraph 24 which required "SE…[to] cooperate regarding the exercise of the right of the Purchaser under the Contract of Sale…."  Of course, also imposed on these express obligations is the obligation which implies a covenant of good faith and fair dealing in all contractual relations and which requires that "'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." Dalton v. Educational Testing Service, 87 N.Y.2d 384, 396, 663 N.E.2d. 289, 296, 639 N.Y.S.2d.  977, 984 (1995) (quoting Kirke La Shelle Co. v. Armstrong Co., 263 N.Y. 79,87, 188 N.E. 163); see also Gross v. Empire Healthcare Assurance, Inc., 16 Misc.3d 1112A, 847 N.Y.S.2d. 896 (Supreme Court, New York County, 2007) (a party breaches its duty of good faith and fair dealing "where it exercises a contractual right as part of a scheme to . . . deprive the other party of the fruit of its bargain.")

Miller's actions are characterized by a total lack of cooperation and reek of bad faith.

First and foremost, the record is clear that Binder did not even know that he was required to appear at noon on November 1, 2010 and close. Quite simply, no one ever advised him or his attorney that the closing was taking place at noon.

On October 25, 2010, Abrams notified Lazar by e-mail that the closing would proceed on November 1, 2010, at 10:30 a.m. (Exhibit R). The documentary evidence shows that starting October 19, 2010, Schaap and Hurwitz's office began to discuss moving the closing to later in the day. There is reference in the documents to a 1:30 p.m. closing on November 1, 2010. (Exhibit T). Ultimately, Schaap and Hurwitz's office agreed to close at noon on November 1, 2010. (Exhibit EE ).

It is uncontroverted that no one from the Miller side ever advised anyone on the Binder side that the time of the closing had been changed. (Exhibit P, at pages 80-81 and Exhibit Q, at page 129). The only testimony in the depositions on this matter came from Hurwitz. Hurwitz testified that sometime after receiving Lazar's letter late afternoon on Friday, October 29, 2010, in which Lazar indicated that he and Binder were available to close at 4:30 p.m. the following Monday, he called Lazar's cell phone. According to Hurwitz, Lazar did not answer his phone. He left a message on Lazar's cell phone in which he said, in part, "…I believe it's [the closing] on for 10:00 to 10:30 in the morning…." (Exhibit Q, at pages 124-125.)   At the same time, Hurwitz acknowledged that earlier that day, at 1:26  p.m., he asked Abrams to send an e-mail to Schaap requesting that the closing be moved to noon.  (Exhibit Q, at page 128).   Hurwitz admitted that he never told Lazar that the closing was scheduled for 12 noon. (Exhibit Q, at page 129).

Lazar's statement in his affidavit that he did not receive any such call from Hurwitz on his cell phone and Hurwitz's own telephone records put into serious question whether Hurwitz even made the call in the first place. However, even if this Court believes that Hurwitz made the telephone call, he has testified to telling Lazar in that telephone call that the closing was taking place at a time which he knew to be different from the time his office was asking Tillow to appear.

Quite simply, SE cannot claim that the Tillow Contract and the Joint Venture Agreement had to close simultaneously, that SE had the absolute right to unilaterally set that time, tell Binder that the closing is taking place on November 1, 2010 at 10:30 a.m., move the closing to noon of that day without telling Binder, and then seek to default Binder for appearing, ready willing and able to close, at 4:30 p.m. of that day.  In fact, it is undisputed that SE never scheduled a simultaneous closing of the two transactions.  On the contrary, it told Binder to appear at 10:30 a.m. and it scheduled the Tillow Contract closing for noon.

Additionally, Article 23 of the Tillow Contract provided that the closing of that contract take place "…at 10:00 a.m. on November 1, or such earlier date…as the parties may agree upon…." Paragraph 4 of the Joint Venture Agreement provided that "…SE shall not modify…the Contract of Sale with Binder's prior written consent…."

In view of the foregoing provisions, the unilateral change by Miller of the closing time, first from 10:00 a.m. to 10:30 a.m. and then from 10:30 a.m. to noon, constituted a clear breach by SE of the Joint Venture Agreement.  Quite simply, SE had no right to set the closing time for any other time then the time set out in the Tillow Contract without Binder's written consent.

Of course Miller could have easily arranged for the two transactions to close simultaneously in one of several ways.   His refusal to do so and his decision to default Binder, instead,  constituted a serious breach of the Joint Venture Agreement.   The course of conduct which Miller adopted also speaks volumes about his true motivation in declaring the default. Essentially, Miller was intent on creating a scenario which would afford him the opportunity to extort additional money from Binder.

In the first instance, Miller could have acceded to Binder's request for an adjournment of a week or two at the most.  All parties involved would have surely found a mutually acceptable time when a simultaneous closing could have been accomplished.

The undisputed facts are that without any excuse or explanation, Miller's attorneys refused to take any steps to adjourn the November 1, 2010 closing date.  Especially in light of Tillow's willingness to close at a later date, this refusal was an egregious breach of the Joint Venture Agreement.

The only excuse which Miller has provided for refusing to seek an adjournment of the closing beyond November 1, 2010 is based on advice he allegedly received that by virtue of the language in the Tillow Contract, the closing of the Tillow Contract had to take place on November 1, 2010 or 553 LLC would be in default of the contract.  (Exhibit BB, at pages 2-3, paragraph 8).

Paragraph 23 of the Tillow Contract provides that "…the Closing shall take place at the offices of the Seller's attorney, at 10:00 a.m. on November 1, 2010, or such earlier date and/or such other place as the parties may agree upon…."  In fact, the law in New York is crystal clear that nothing in this language mandated that Miller close on November 1, 2010, or be held in

default. It is highly unlikely that Hurwitz, a real estate practitioner for some 35 years (Exhibit Q, at page 9) would have advised Miller that he would be in default of the Tillow Contract if he did not close on November 1. This is just one more pretext which Miller utilized to concoct a default on the part of Binder with the goal of squeezing him for more money.

In New York "…When there is a certification [in a contract] that time is of the essence…each party must tender performance on law day unless time for performance is extended by mutual agreement…." Grace v. Nappa, 46 N.Y.2d. 560,565, 415 N.Y.S.2d 793,797(1979). In all other instances …time is never of the essence in real estate contracts, even if the closing date is stated…." Whitney v. Perry, 208 A.D. 3d.1025,1026, 617 N.Y.S.2d 395,396 (3rd Dept. 1994); Sohayegh v. Oberlander, 155 A.D.2d. 436,436, 547 N.Y.S.2d 98,100(2nd Dept. 1989); Andesco, Inc. v. Page, 137 A.D. 2d 349, 355-356, 530 N.Y.S.2d. 111,114 (1st Dept. 1988); Spence v. Curry, 126 AD2d 632,633, 511 N.Y.S.2d. 69,69 (2nd Dept. 1987). "When a contract for the sale of real property does not make time of the essence, the law permits a reasonable time in which to tender performance, regardless of whether the contract designates a specific date for performance…." Savitsky v.Sukenik, 240 A.D.2d. 557,558, 659 N.Y.S. 2d 48,49 (2nd Dept. 1997); Grace v. Nappa, supra ; Zev v. Merman, 134 A.D. 2d 555,557, 521 N.Y.S.2d. 455,457 (2nd Dept. 1987), aff'd 72 NY2d 78, 533 N.E.2d. 669, 536 N.Y.S.2d. 739 (1988).

By way of example, where time is not made of the essence, parties have a right to a reasonable adjournment of the closing date where contracts for the sale of real estate provide that the closing take place ". . . . no later than August 21, 1994 . . . ." Savitsky, supra, 240 A.D. at 558, 659 N.Y.S.2d at 49. Parties may adjourn the closing where the contract provides for a closing to take place "…in no event later than sixty (60) days after the scheduled closing

date….” <u>Whitney</u>, <u>supra</u>, 208 A.D. 3d. at 1025-26, 617 N.Y.S.2d at 395-96. Parties may adjourn the closing where the contract fixes an “on or before” date. <u>O’Connell v. Clear Holding Co</u>., 126 A.D.2d 530,531 510 N.Y.S. 2d 653,654 (2d. Dept. 1987). Finally, the parties may adjourn the closing where the contract fixes an “inside date” and an “outside date” of closing. <u>Leading Building Corp. v. Segrete</u>, 60 A.D. 2d 907, 401 N.Y.S. 2d 561,562 (2d. Dept. 1978), <u>app</u>. <u>dism’d</u>., 44 N.Y. 901, 407 N.Y.S. 2d 697 (1978).

Based on these principles, Miller had an absolute right to adjourn the Tillow Contract closing, even if Tillow objected.  Lazar indicated as much to Hurwitz in an e-mail on October 29, 2010 when he wrote:  “As you know you have an absolute right to adjourn the real estate closing. Have you made a request to Tillow’s attorney? If so what was their response?” (Exhibit Z). Hurwitz’s response was silence.  He never even made  the request.

If Miller was not inclined to adjourn the closing for the one or two weeks that Binder needed,  he could have easily closed the Joint Venture Agreement sooner.

As of late Friday afternoon, October 29,2010,  Lazar had provided Hurwitz with notice that he was prepared to close at 4:30 p.m. on Monday, November 1.   Hurwitz testified at his deposition that he made no effort to contact Schaap to determine if he was available to close the Tillow Contract at 4:30 p.m. (Exhibit Q, at page 111).  In light of Tillow’s willingness, expressed in his certification, that he was willing to close at any mutually convenient time in the year 2010, it is highly likely that he would have been available to close at that time.  (Exhibit DD).

Miller, if he is to be taken at his word, was not available late in the afternoon of November 1, because he was preparing to host a dinner party in his home.  However, if he truly wanted the closing to proceed, he could have provided Hurwitz with a power of attorney to close

on his behalf.   Particularly in cases where all a party is doing is collecting proceeds from a sale, which is what Miller was ultimately doing in the joint venture transaction, real estate transactions are often closed in this fashion.   Miller was in the Hurwitz's offices until at least three or three thirty in the afternoon of that day.   He could have easily executed any documents necessary to close the Joint Venture Agreement.

If, for some reason, Miller did not trust Hurwitz, his lawyer of 20 years,  to collect the proceeds on his behalf and wanted to be personally present, he could have appeared the following day, November 2, the date to which Hurwitz claims he conditionally adjourned the closing.

Miller, could have adopted any of these practical and reasonable approaches to consummating the transaction with Binder.  Instead he declared a default.

In any event, there is a serious question as to whether or not the Tillow Contract and the Joint Venture Agreement were, as a matter of contract law,  required to close simultaneously in the first place.  There is no language in the Joint Venture Agreement which specifically mandates a simultaneous closing prior to November 1.   The right of SE "…to control and close the contract…." pursuant to Paragraph 4 of the Joint Venture Agreement does not on its face encompass SE's right to insist that the two transactions close simultaneously prior to that date.

Significantly,  in Paragraph 9 of the Joint Venture Agreement(Exhibit A), the parties provided that "…[a]ny closing date after November 1, 2010 which binds 553 LLC shall simultaneously bind Binder to the same extent…."  Thus in this paragraph the parties specifically provided for a simultaneous closing date if the closing was to take place after November 1.  This

is further evidence that up to and including November 1 there was no legal requirement that the two transactions close at the same time.

Additionally, the Tillow Contract (Exhibit O) at Paragraph 23, in the first instance, fixes the location of the closing as the Seller's attorney's office, i.e. the office of William Schaap.  The Joint Venture Agreement provides for Seymour Hurwitz's office as the closing location.  If Miller intended that the two transactions close simultaneously, he would have also made sure that the geographical closing location of the two transactions was the same.

All of the foregoing points away from a legal obligation on the part of Binder to appear and close the Joint Venture Agreement at the time set for the closing of the Tillow Contract.  All Binder was required to do was to appear on November 1, 2010.  As previously noted, he met that obligation.  Therefore it cannot be said that he defaulted under the Joint Venture Agreement.

In summary, neither Miller nor his attorneys have ever adequately explained why they refused to even request an adjournment from Tillow.  In refusing to adjourn the closing Miller violated both the express terms of Joint Venture Agreement  which required SE, among other things, to  "fully cooperate" towards a closing  and the implicit covenant of good faith and fair dealing, which is part of every agreement.

C.  Miller's Other Breaches of the Joint Venture Agreement

Paragraph 4 of the Joint Venture Agreement(Exhibit A) also provides that the ". . . parties and their respective attorneys . . . shall keep each other fully informed . . . ."  and Paragraph 24 requires SE to ". . . advise Binder promptly of all notices that SE receives pertaining to the

[Tillow Contract]." Based on the documentary evidence and the deposition testimony of Miller, Hurwitz and Abrams, it is clear that SE breached these provisions.

The documentary trail, commencing with the signing of the Joint Venture Agreement and culminating with the events of November 1, 2010, present a consistent pattern of the failure on the part of Miller and his attorneys to keep Binder and his lawyer "…fully informed…"  In fact, they did not keep them informed at all.  This right was of special significance to Binder because by the terms of the Joint Venture Agreement Miller had denied Binder direct access to Tillow.

There can be no more fundamental a breach of the obligation to keep the other side "fully informed" then to set a time for closing, later change that time and not disclose to the other side that the time set for the closing had been changed.  This is particularly so in this case, where Miller claims that he expected that the two transactions would close simultaneously. (Exhibit BB, at page 3, paragraph 8).

Yet, as previously noted, it is uncontroverted that Miller and his attorneys never informed Binder or his attorney that the November 1 closing was being pushed from the 10:30 a.m. time slot on November 1, 2010 provided in the October 25, 2010 letter from Hurwitz to Lazar to noon of that day.  If Hurwitz is to be believed, he told Lazar on October 29, 2010 that the closing was taking place at 10:00 a.m. or 10:30 a.m., despite the fact that earlier on October 29 he had instructed his associate to move the closing to noon.

It is beyond dispute that in multiple written communications Schaap sent to Hurwitz's office various documents which would be used at the closing.  They included a proposed deed which was later revised, form of note and mortgage, and related affidavits (Exhibits KK, LL, MM, NN and OO).  Miller was the man in the middle of the two transactions.  He would simply

flip his rights under the Tillow Contract to Miller in exchange of a handsome profit.  Binder was the ultimate purchaser.  As such, Binder, much more than Miller, had a strong  interest in making sure that all the documents by which title to the Brownstone would ultimately be conveyed to him, were in order.

Yet, it is uncontroverted that no one ever forwarded any of these documents to Lazar prior to November 1.

The documentary evidence also shows that Schaap provided Hurwitz with various calculations which impacted on the closing adjustments.  (Exhibits PP, QQ, RR). Under the terms of the Joint Venture Agreement, Binder was responsible for funding the balance due from 553 LLC to Tillow, and using a portion of the balance to pay most of the closing adjustments. See Joint Venture Agreement (Exhibit A), Paragraph 13. There can be no question that those calculations were highly relevant to determining the amount of the balance.

Yet, it is uncontroverted that Miller's attorneys never informed Binder or his attorney of any of these calculations or any exchanges relating to these calculations.  Ironically, Miller had to audacity to claim in a prior affidavit that one of the grounds for Binder's default was his failure to "…request payment instructions . . . . " (Exhibit BB, at page 10, paragraph 31).

In sum, there was a total failure on the part of Miller to keep Binder informed,  much less fully informed, as required under the Joint Venture Agreement.

By the terms of Paragraph 20 of the Joint Venture Agreement, " … .Copies of all material communications sent to or received after the date hereof from Seller [Tillow], or the attorneys for the Seller, shall be transmitted to the attorney for Binder…."

The unrefuted record shows that neither Miller nor his attorneys ever transmitted one single communication which they received from Schaap to Binder's attorneys.  As previously noted, those communications addressed, at a minimum, the time of the closing, documents to be utilized at the closing and calculations relating to closing adjustments.  With respect to the communications addressing the time of the closing and closing adjustments, when asked at his deposition whether he considered them to be "material communications," Abrams, an admittedly experienced real estate practitioner, answered that he did not know. (Exhibit P, at pages 88-91.)

It is respectfully submitted that nothing exemplifies the sheer frivolousness of Miller's claims in this litigation nor the disingenuous character of the responses provided by his lawyers to questions at their deposition, then that answer.

Miller's refusal to close either on November 1 or November 2, his refusal to adjourn the closing without any good reason, his failure to provide Binder with important information needed by Binder to close the transactions and his failure to provide Binder with communications which were material to the consummation of the transactions clearly point to a plan on Miller's part.  When Miller realized that he made, what he believed to be, a bad deal with Binder, he set on a deliberate course to default Binder so he could then exact a higher price for the Brownstone.  On the morning of November 2, 2010, Miller made his intentions clear when he wrote to Lazar:  "…If he [Binder] now wishes to conclude the transaction on which he defaulted it will not be without cost…." An e-mail sent by Miller which accidently found itself into Binder's hands shows that Miller miscalculated.  It reads, "[w]e guessed wrong on Binder, because he just started a lawsuit."  (Exhibit GGG).

The unambiguous evidence is that it was SE, in the person of Miller, who defaulted under Joint Venture Agreement.  It is respectfully submitted that this Court grant Binder a judgment directing SE to comply with the terms of the Joint Venture Agreement.


POINT III

BINDER IS ENTITLED TO DAMAGES IN ADDITION TO SPECIFIC PERFORMANCE

It is well established that "damages are available in New York when a party seeks specific performance regarding the purchase of real property." Petrello v. White,  2011 U.S. Dist. LEXIS 115622 (E.D.N.Y. 2011). Accordingly, "[t]he court will award to the purchaser, in addition to specific performance of the contract, such items of damage as naturally flow from the breach, are within the contemplation of the parties, and can be proven to a reasonable degree of certainty." Id., quoting Freidus v. Eisenberg, 123 A.D.2d. 174,177, 510 N.Y.S.2d 139, 142(2nd Dept. 1986).

As is established in his accompanying affidavit, Miller's default has caused Binder substantial monetary damage. These damages include, without limitation, the difference between the costs of Binder having to continue to rent living quarters for himself and his family and the cost of paying the expenses associated with owning the Brownstone.  Binder calculates that these damages, which continue to accrue, are to date in excess of $220,000.

In addition, at the time he signed the Joint Venture Agreement, the lease on his apartment was expiring, and the landlord wished to sell the apartment.   Binder and his family were forced to move.  Had the Joint Venture Agreement closed on a timely basis, he would have been able to move into the Brownstone at least a year and one-half sooner.  Under the circumstances, he was

were forced to move to interim housing.  He incurred in excess of $70,000 in moving and storage charges, which would not have otherwise been necessary had Miller not defaulted.

Further, Binder expended $17,260 for a loan commitment fee with First Republic Bank. The funds which First Republic Bank was going to provide, were intended to help finance the purchase and renovation of the Brownstone.  Due to Miller's default, Binder has lost that commitment fee.

Given Miller's, and therefore SE's, bad faith,  Binder also is entitled to legal fees he has incurred in seeking to compel SE to meet its contractual obligations.

Since Miller remains in possession of the Brownstone, Binder also is entitled to the value of its use and occupancy  throughout the period of  SE's wrongful failure to convey. See Petrillo, supra, 2011 U.S. Dist. LEXIS 115622;  In re: 114 Tenth Avenue Assoc., Inc., 427 B.R. 283, 296-97 (Banky. S.D.N.Y. 2010); Freidus, supra, 123 A.D.2d. at 177-78, 510 N.Y.S.2d. 139, 142-43.

Therefore, in addition to seeking specific performance of the Joint Venture Agreement, Binder is entitled to recover his damages, and requests that the Court to conduct an inquest with respect to same.

CONCLUSION

Plaintiffs' motion for summary judgment, and an order awarding Binder specific performance and directing that an inquest be conducted as to his monetary damages, should be granted in all respects.

Dated:  New York, New York
        May 7, 2012

                              Respectfully submitted,


                              KLESTADT & WINTERS, LLP

                         By:/s/Tracy L. Klestadt_____
                              TRACY L. KLESTADT
                            570 Seventh Avenue, 17th Floor
                            New York, New York 10018
                            Tel.:  (212) 972-3000
                            Fax:  (212) 972-2245



                              MOSS & KALISH, PLLC

                         By: /s/Mark L. Kalish_____
                             MARK L. KALISH
                            122 East 42nd Street, Suite 2100
                            New York, New York 10168
                            Tel.:  (212) 867-4488
                            Fax:  (212) 983-5276

Of Counsel:
Mark L. Kalish, Esq.
James Schwartzman, Esq.