UNITED STATES BANKRUPTCY COURT　　　　　　NOT FOR PUBLICATION
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
In re:

553 West 174th LLC, *et. al.*

　　　　　　　　　　　　　　　　　　Debtors.
------------------------------------------------------------x
Brian Binder and 553 West 174th St. LLC,

　　　　　　　　　　　　　　　　　　Plaintiffs,

　　　　　v.

SE Opportunity Fund LP, Seth Miller, Seymour
Hurwitz, and Steven Etkind,

　　　　　　　　　　　　　　　　　　Defendants.
------------------------------------------------------------x

BK. No. 11-14968-SHL
Chapter 11

Adv. No. 12-01054

**MEMORANDUM OF DECISION**

　　Before the Court is an adversary proceeding commenced by plaintiffs Brian Binder and 553 West 174th St. LLC ("Plaintiffs") seeking specific performance of a contract to sell Binder a brownstone building at 120 West 74th Street, New York, New York (the "Premises"). Plaintiffs allege that the contract was breached by defendants SE Opportunity Fund LP, Seth Miller, Seymour Hurwitz, and Steven Etkind ("Defendants"). Based on evidence introduced at a three day trial, the Court finds that Defendants breached the contract for the sale of the Premises. The Court further concludes that Plaintiffs are entitled to specific performance because the Plaintiffs were ready, willing, and able to perform the sales contract. This memorandum constitutes the Court's findings of fact and conclusions of law.

**BACKGROUND**

The basic facts of the proposed sale are undisputed. On April 20, 2010 Debtor 553 West 174th LLC ("553 West 174th Street" or "Debtor") entered into a contract with Walter Tillow for the purchase of the Premises for a price of $3,775,000 (the "Tillow Contract").[1] Pls.' Ex. 3. Tillow was represented in the transaction by his attorney, William Schapp. Trial Tr. 106:22-107:9, Oct. 17, 2012. The Premises was expected to become the Debtor's sole asset after the closing.

The Debtor's sole member is SE Opportunity Fund ("SE"), an entity controlled by Seth Miller. Trial Tr. 21:1-8, Oct. 17, 2012. On October 8, 2010, Binder entered into a joint venture agreement with SE under which Binder would become the sole interest holder in the Debtor for a purchase price of $4,626,750 (the "JV Agreement") Pls.' Ex. 2. Thus, Binder was to become the ultimate purchaser of the Premises, but at a price greater than Debtor agreed to pay to Tillow. This arrangement allowed Miller, through the Debtor, to realize a profit by "flipping" the property to Binder. Binder was represented in this transaction by Larry Lazar. Trial Tr. 18:2-21, Oct. 17, 2012. Miller was represented in the transaction by Seymour Hurwitz and Mark Abrams. Trial Tr. 7:25-8:4, Oct. 22, 2013; Trial Tr. 11:1-5, Oct. 18, 2012.

It is undisputed that the parties, at least initially, contemplated that the Tillow Contract and the JV Agreement would close on the same date so that, as soon as the Premises became part of the Debtor's assets, Binder would then become the sole interest holder in the Debtor and the owner of the Premises. Trial Tr. 108:23-25; 109:1-15, Oct. 22, 2012; Trial Tr. 158:17-20, Oct. 18, 2012. Nonetheless, nothing in the JV Agreement required the JV Agreement and the Tillow

---

[1] The Tillow Contract, JV Agreement, and other documents defined in this Decision were all introduced as exhibits at the trial.

2

Contract to close on the same day. Instead, the JV Agreement provided that its closing would occur on November 1, 2010 at Hurwitz's office, and that any closing after November 1, 2010 that bound 553 West 174th Street would also bind Binder. JV Agreement ¶ 9. In this way, the JV Agreement would be adjourned if the Tillow Closing had not yet occurred. But the JV Agreement also stated that Binder had no right to adjourn the closing of the Tillow Contract without SE's prior written consent. *Id*. ¶ 5.

As to payment, the JV Agreement required Binder to fund all monies at the closing, except for those costs explicitly carved out to be paid by SE. *Id*. ¶ 4. Failure to fund the monies would have resulted in default. *Id*. The parties agreed that in funding the closing, Binder had the right to pay a portion of the consideration due to seller in the form of a $2.5 million purchase money mortgage. Trial Tr. 35:3-8, Oct. 18, 2012.

By entering into the JV Agreement, the parties agreed to cooperate with each other in certain material respects. For example, the JV Agreement required that copies of all material communications sent to or received from Tillow or his attorneys, be transmitted to Binder's attorney. JV Agreement ¶ 20. It also generally required SE and Binder to cooperate regarding the exercise of the rights of the purchaser under the Tillow Contract, and for SE to advise Binder promptly of all notices that SE received pertaining to the Tillow Contract. *Id*. ¶ 24.

The JV Agreement never closed. Each side blames the other for the failure to close. Plaintiffs complain that the Defendants frustrated the closing by: (1) failing to provide the Plaintiffs with material documents, other relevant communications, and information in the days leading up to November 1, 2010, and (2) failing to act in good faith towards a successful closing of the contract. *See* Pls.' Mem. of Law at 9-14 (ECF No. 16). In addition to their allegations of Defendants' breach, Plaintiffs also assert that they were entitled to an adjournment of the closing

date. Despite Defendants' refusal to agree to an adjournment, however, Plaintiffs contend they were ready, willing, and able to close the JV Agreement on November 1, 2010. Plaintiffs thus seek specific performance of the contract. *Id*. at 9-11.

The Defendants, on the other hand, allege that Binder breached the JV Agreement by failing to tender performance. *See* Defs.' Mem. of Law (ECF No. 18). Defendants contend that Binder did not take the steps necessary to meet the closing requirements set forth in the JV Agreement, and that he was not ready, willing, and able to close the JV Agreement on the closing date. *Id*. at 1-9. Defendants also allege that Binder anticipatorily breached the JV Agreement by demanding an adjournment of the closing date and by demanding that the premises be delivered in broom clean condition. *Id*. at 10-13.

On November 19, 2010, Plaintiffs commenced this action in the Supreme Court of the State of New York, New York County, Index No. 115207/10 (the "Complaint"). On October 26, 2011 (the "Petition Date"), Debtor filed a voluntary petition under Chapter 11 of the United States Code, 11 U.S.C. §§101 *et seq*. in the United States Bankruptcy Court for the Southern District of New York. On February 7, 2012 the Debtor's attorney filed a *Notice of Removal* removing this case to the United States District Court for the Southern District of New York (EFC No. 1, at Ex. 2), and on February 10, 2012 the Debtor's attorney filed an *Amended Notice of Removal* (ECF No. 2, at Ex. 3). On February 16, 2012 the District Court referred the case to this Court. (ECF No. 1). On October 17, 18, and 22 of 2012, this Court held a trial on the merits of the Complaint.[2]

---

[2] The parties both consented to trial before this Court. *See Amended Stipulation And Case Management Order* (ECF No. 2).

4

**DISCUSSION**

To prove a breach of contract claim, a party must establish: 1) existence of a valid contract, 2) material breach of the contract by the other side, 3) plaintiff's performance of the contract, and 4) resulting damages. *See JPMorgan Chase v. J.H. Electric of New York, Inc.,* 69 A.D.3d 802, 893 N.Y.S.2d 237 (2nd Dept. 2010); *Furia v. Furia,* 116 A.D.2d 694, 498 N.Y.S.2d 12 (2nd Dept. 1986); *Bandachowicz v. McFarland,* 2009 NY Slip Op 32012 at 6 (N.Y. Sup. Ct., NY County 2009). In analyzing the parties' competing arguments, the Court will first address the events prior to the closing date and then turn to the parties' actions on the closing date itself.

**A. Events Leading Up to the Closing**

In the days leading up to closing date, Miller and his counsel failed to communicate with the Plaintiffs—almost at all—regarding the timing of the closing, closing costs, and documents necessary to proceed with closing on the JV Agreement. Trial Tr. 64:18─65:25, Oct. 17, 2012; Trial Tr. 13:13─16:4, Oct. 18, 2012. This lack of cooperation is evidenced throughout the communications among counsel prior to the closing date of November 1, 2010. After signing the JV Agreement on October 8, 2010 (Trial Tr. 31:13–32:14, Oct. 17, 2012), Binder's counsel Lazar did not hear again from Defendants until receipt of an email from Hurwitz on October 25, 2010, five days before the proposed closing date. In that email, Hurwitz unilaterally set the time for the closing at 10:30 a.m. Pls.' Ex. 4; Trial Tr. 39:21–25, Oct. 17, 2012. Lazar responded to that email on the same day, identifying a few open items to be addressed before the closing could proceed. Pls.' Ex. 5. On the next day, October 26, 2010, Lazar sent another email to Hurwitz indicating that a November 1, 2010 closing date was premature and asking Hurwitz to respond. Pls.' Ex. 6. Lazar followed up with another email to Hurwitz on October 27, 2010. Pls.' Ex. 7. It stated that, as the contract was an "on or about" contract and did not contain the phrase "time

5

is of the essence," the closing date listed in the JV Agreement was merely a target that could be moved. Pls.' Ex. 7; Trial Tr. 47:17–48:5, Oct. 17, 2012. In that same email, Lazar indicated that his client expected to be able to close about a week later than the closing date in the JV Agreement. Pls.' Ex. 7. Lazar testified that he sent these emails to Hurwitz because, given the lack of communication between the parties and the outstanding items that still needed to be addressed before closing, he was surprised that Hurwitz's email of October 25th contemplated a closing only a few days later. Trial Tr. 40:20-41:14, Oct. 17, 2012. In addition to identifying the outstanding items, Binder requested the adjournment to have an opportunity to find alternative financing for the Premises. Trial Tr. 46:18-25, Oct. 17, 2012.

On the evening of October 27, 2010, Hurwitz responded to Lazar's multiple messages with a facsimile. Pls.' Ex. 8. The communication did not provide any of information that Lazar had requested in his prior emails but instead advised Lazar that

> " . . . November 1, 2010 is the date set for closing both in the [Tillow Contract] and the [JV Agreement]. Pursuant to the [JV Agreement], your client is required to close on that date and so as to avoid a default under the underlying contract, my client insists that your client provide all of the funds on November 1, 2010 in accordance with the terms of the [JV Agreement]. . . ."

Pls.' Ex. 8.

The facsimile did not specify a time for the closing. *Id.* After Hurwitz's message, Lazar sent three more emails to Hurwitz, with one message again outlining the outstanding documents that still needed to be provided to Plaintiffs by Defendants prior to closing.[3] Pls.' Ex. 9; Pls.' Ex. 10.

---

[3] The other two emails included further discussions of the requested adjournment. Pls.' Ex. 9; Ex. 10. Lazar testified that while all these messages were being exchanged, he was also calling Hurwitz and that Hurwitz was assuring him that he would secure an adjournment of the closing to allow Binder an opportunity to find alternative financing. Trial Tr. 49:1-15, Oct. 17, 2012. Hurwitz, however, disputes that testimony. Although he acknowledges receiving the calls, he claims that he never promised an adjournment of the closing. Trial Tr. 16:14-17:3, Oct. 22, 2012. Given the Defendants' breach of the JV Agreement in other ways, Court does not need to resolve this factual dispute regarding communications over a possible adjournment.

Finally, on October 29, 2010 at 4:25 p.m., having failed to secure an adjournment of the closing date from Hurwitz, Lazar sent another letter to Hurwitz indicating that Binder would be prepared to close the transaction on November 1, 2010 at 4:30 p.m. Pls.' Ex. 12. In that message, Lazar also provided his cell phone number so that Hurwitz could reach him over the weekend if he wanted to discuss the closing. *Id.* That communication, like the three prior, were not responded to by the Defendants. Trial Tr. 64:9-24, Oct. 17, 2012; Trial Tr. 62:6-12, Oct. 22, 2012.

Defendants' "radio silence" is particularly conspicuous given Defendants' frequent contact with the seller Tillow during the same period. During the days leading up to the closing of the Tillow Agreement, counsel for Miller and SE was in frequent communication with Schapp, counsel to Tillow, regarding the Tillow Contract. Pls.' Ex. 22-28. But Binder received none of the communications—numbering not less than eight— between Schapp and counsel to Miller and SE between October 19, 2010 and October 30, 2010.[4] Trial Tr. 13:21─14:7, Oct. 18, 2012; Trial Tr. 65:6─67:9, Oct. 17, 2012. The content of these messages included communication relating to the election of the purchase money mortgage, copies of the deed, closing adjustments amounts, and affidavits regarding the Foreign Investment in Real Property Tax Act. Pls.' Ex. 22-28. Defendants' failure to convey their communications with Tillow to Plaintiffs constituted a breach of the JV Agreement, which required Defendants to give Binder "[c]opies of all material communications sent to or received after the date hereof from [Tillow], or the attorneys for [Tillow] . . . ." JV Agreement ¶ 20. Although counsel for Miller and SE testified that he was not sure if these communications were actually material, it is difficult to

---

[4] The email address listed in the email communication in Plaintiffs' Exhibits 22-28 is "syHurwitz@aol.com," which was the email address for Hurwitz's office. Abrams testified that he had seen these emails and that he was the person primarily responsible for these communications with Schapp. Indeed, much of the correspondence in question is addressed to "Mark" which is Abrams first name. Trial Tr. 11:1─12:15, Oct. 18, 2012.

7

imagine what could be more material for closing this real estate transaction than information about the deed to the property and the closing adjustment amounts that Binder was contractually obligated to pay at the closing. Trial Tr. 16:1-4, Oct. 18, 2012. Indeed, the Court concludes that the information in these emails was material, as contemplated in paragraph 20 of the JV Agreement. JV Agreement ¶ 20. By not providing Plaintiffs with these documents, Defendants breached the explicit requirements of the JV Agreement.

But even assuming that these communications were not material, the failure to advise Binder of these documents nonetheless was a breach of the requirement in paragraph 24 of the JV Agreement to promptly advise Binder with "all notices" from Tillow regarding the closing of the Tillow Contract. JV Agreement ¶ 24. That provision is broader than the "material" communication requirement set forth in paragraph 20 and clearly captures the communications from Schapp in the days leading up to the closing. Despite Plaintiffs' repeated requests for precisely the type of information contained in the messages, Defendants did not directly respond to Lazar's requests and did not even bother forwarding the emails containing the information. At best, this behavior is a glaring oversight that constitutes a breach of Defendants' duties under the contract. At worst, the lack of communication was an intentional attempt to frustrate the closing.[5]

Moreover, despite Defendants' repeated claim that the Tillow Contract and the JV Agreement were supposed to close simultaneously, neither Defendants nor their counsel informed Plaintiffs that the closing for the Tillow Contract had been scheduled for 12:00 p.m.

---

[5] As part of the record in the Debtor's bankruptcy case, evidence was introduced that after entering into the JV Agreement with Binder, SE Opportunity received another competing bid for the Premises in the amount of $5.5 million. *See* Debtor's Disclosure Statement p. 5 (ECF No. 7). That amount is significantly higher than the amount Binder was obligated to pay under the terms of the JV Agreement. Although the Court need not rely on this information in reaching its decision in the case, this fact suggests a motive for Defendants' lack of cooperation in closing the contract with Plaintiffs.

8

Trial Tr. 65:6─67:20, Oct. 17, 2012; Trial Tr. 13:13─16:4, Oct. 18, 2012; Pls.' Ex. 29.  Indeed, the Defendants set this time on the same day — October 29, 2010 — that Defendants were simultaneously ignoring Plaintiffs' request that Defendants hold the closing for the JV Agreement at 4:30 p.m.  Trial Tr. 64:18─67:20, Oct. 17, 2012; Trial Tr. 84:11─88:6, Oct. 17, 2012; Trial Tr. 13:21─14:7, Oct. 18, 2012; Trial Tr. 62:6-12, Oct. 22, 2012.  While Defendants had no obligation to accede to Plaintiffs' request for a 4:30 p.m. closing, nothing in the JV Agreement gave the Defendants the unilateral right to set the time for the closing.  Defendants' cooperation and transparency with Schapp in scheduling the Tillow closing stands in marked contrast to Defendants' lack of cooperation with Lazar and his client regarding the closing for the JV Agreement.

      For all the reasons described above, the Court concludes that Defendants' actions prior to November 1, 2010, breached the express provisions of JV Agreement requiring parties to cooperate towards closing.  And even if the JV Agreement did not contain any express requirement to cooperate, Defendants would have been in breach of the implied covenant of good faith and fair dealing.  *See Dalton v. Educational Testing Service*, 87 N.Y.2d 384, 396, 663 N.E.2d. 289, 296, 639 N.Y.S.2d. 977, 984 (1995) (requiring that "'neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract." (quoting *Kirke La Shelle Co. v. Armstrong Co.*, 263 N.Y. 79,87, 188 N.E. 163)); *see also Gross v. Empire Healthcare Assurance, Inc.*, 2007 WL 2066390 (N.Y. Sup. Ct., NY County 2007) (a party breaches its duty of good faith and fair dealing "when it exercises a contractual right as part of a scheme to . . . deprive the other party of the fruit of its bargain").

      For their part, the Defendants claim Plaintiffs breached the JV Agreement in several ways leading up to the closing date, but the Court finds none of these arguments to be supported

9

by the credible evidence or the language of the JV Agreement. Several of these arguments are worth mention.

First, Defendants complain that Binder had not informed them of his intent to utilize the purchase money mortgage prior to the closing date, nor had Binder purchased insurance on the Premises as required under the JV Agreement. Defs.' Mem. of Law at 10-13. But nothing in the JV Agreement required the Plaintiff to elect the purchase money mortgage prior to closing. JV Agreement ¶ 30. In any event, SE and Miller's own counsel testified that the 553 West 174th Street had already elected to use the purchase money mortgage and purchased the required insurance prior to the closing so Binder did not need any additional paperwork to elect the purchase money mortgage at closing. Trial Tr. 36:20-38:6, Oct. 18, 2012. Indeed, there appears to have been little for Binder to do at closing except pay for the costs of the shares in 553 West 174th Street, a fact essentially conceded by Hurwitz. *Id.*; Trial Tr. 84:5-13, Oct. 22, 2012 (closing for the JV Agreement could conceivably have lasted less than a half hour).

Second, Defendants allege that the Plaintiffs anticipatorily breached the JV Agreement on several occasions, purportedly relieving Defendants of their duty to perform. Defs.' Mem. of Law at 10-13. But none of the claimed instances meet the standard for anticipatory repudiation, which require a party to "disclaim the duty to perform under the contract prior to the time designated for its performance and before it has received all the due consideration." *Rivera-Ramos v. Welsh*, 10 Misc. 3d 1071(A), 814 N.Y.S.2d 564 (Sup. Ct. 2006); s*ee also In re Asia Global Crossing, Ltd.*, 326 B.R. 240, 249-50 *adhered to in part on reargument*, 332 B.R. 520 (Bankr. S.D.N.Y. 2005) (citing *Norcon Power Partners, L.P. v. Niagara Mohawk Power Corp.*, 92 N.Y.2d 458, 682 N.Y.S.2d 664, 705 N.E.2d 656, 659 (N.Y. 1998)).

For example, Defendants rely on an email, dated October 29, 2010, in which Lazar proposes adding $150,000 deposit to the escrow in exchange for adjourning the closing date to November 15, 2010. Pls.' Ex. 10. In that message, Lazar wrote that he hoped that arrangement would work because "otherwise we may wind up in litigation which would be a real shame considering everyone wants to get this deal done." *Id*. But such an email does not rise to the level of anticipatory repudiation, which requires that the threat to not perform be "positive and unequivocal." *In re Asia Global Crossing, Ltd.*, 326 B.R. at 249-50. This message instead appears to be an effort to negotiate a new closing date by offering an incentive, namely a substantial deposit. Even the veiled threat of litigation uses the word "may," and in no way states that the Plaintiffs will not perform. In fact, having failed to secure an adjournment, Plaintiffs sent a follow-up email the same day to Defendants' attorneys affirmatively stating their intention to close the JV Agreement on November 1, 2010 at 4:30 p.m. Pls.' Ex. 12. The parties subsequent conduct, up to and including November 1, 2010, further confirms that no party considered this email to be a positive and unequivocal threat not to perform.

Defendants also point to an email where Plaintiffs ask Defendants to confirm that the Premises will be "vacant and broom clean at closing," contending that this was an attempt to renegotiate the terms of the JV Agreement and unilaterally add additional requirements not present in the JV Agreement. Pls.' Ex. 12. Even though Plaintiff concedes that no "broom clean" requirement exists in the JV Agreement, this statement does not meet the legal standard for anticipatory repudiation. Trial Tr. 60:8-19, Oct. 17, 2012. There is no credible evidence that Plaintiffs threatened not to perform based on a failure to provide the premises in "broom clean" condition. *In re Asia Global Crossing, Ltd.*, 326 B.R. at 249-50 ("For a statement to constitute an anticipatory breach, 'the announcement of an intention not to perform [must be] positive and

11

unequivocal.'") (citing *Argonaut P'ship, L.P. v. Sidek, S.A. de C.V.*, No. 96 Civ. 1967(MBM), 1996 WL 617335, at *5 (S.D.N.Y. Oct. 25, 1996)). In fact, there is no credible evidence that Plaintiffs ever threatened not to perform their obligations under the JV Agreement for any reason. *See Record Club of America*, 643 F.Supp. 925, 936 (S.D.N.Y. 1986) (anticipatory repudiation requires "overt communication of intention not to perform").

### B. The Closing on November 1, 2010

Turning now to events on the day of the closing, the parties offer competing testimony and evidence regarding the day's events, including the location of the parties throughout that day and who said what to whom. Once again, the Court agrees with the Plaintiffs' view of events.

Relevant testimony regarding the closing was offered by Miller, Lazar and Abrams. Miller, for example, testified that he was in Hurwitz's office on November 1, 2010 at approximately 9:30 a.m. Trial Tr. 125:12-19, Oct. 18, 2012. He testified that he met with Lazar there that same morning. Trial Tr. 125:25─126:10, Oct. 18, 2012. Miller further testified that he informed Lazar on that morning that the closing of the Tillow Contract was about to take place "shortly." Trial Tr. 127:3-7, Oct. 18, 2012. He testified that Lazar informed him that he planned on returning to the office at 4:30 p.m. with Binder. Trial Tr. 127:8-17, Oct. 18, 2012. Miller claims that he informed Lazar that he would not be available at 4:30 p.m. because of an event he was hosting at his home later in the evening. *Id.* Miller further testified that the Tillow Contract closed between 2:30 and 3:00 p.m. that day. Trial Tr. 147:17-25, Oct. 18, 2012.

Lazar, on the other hand, testified that he arrived at Hurwitz's offices on November 1, 2010, at approximately 10:00 a.m., the time that had been provided by Hurwitz in his email of October 28, 2010. Trial Tr. 67:10-20, Oct. 17, 2012; Pls.' Ex. 4. He testified that Miller was not at the office and that he did not speak to Miller that morning. Trial Tr. 67:10-20, Oct. 17, 2012.

Further, he testified that Abrams was the only person at the office when he arrived. *Id*. Phone records admitted into evidence indicate that a number associated with Miller's office and personal cell phone called Hurwitz's office on the morning of November 1, 2010 at 10:07 a.m., corroborating Lazar's claim that Miller was not present in Hurwitz's office when Lazar arrived.[6] Pls.' Ex. 39; Trial Tr. 139:10-143:15, Oct. 18, 2012. Lazar further testified, and Abrams did not dispute, that Abrams asked Lazar why he was at the office so early since the closing was scheduled for 4:30 p.m. Trial Tr. 67:10-68:4, Oct. 17, 2012. Lazar claims that he told Abrams that he had not received any communication from his office regarding the closing and that was he was there to inquire about the closing. *Id*. Lazar testified that he then asked Abrams if the parties could engage in a pre-closing of the transaction. Trial Tr. 68:6-69:6, Oct. 17, 2012; Pls.' Ex. 15. According to Lazar, Abrams informed him that he would need to call Miller to get authorization for a pre-closing and that Abrams left his presence to call Miller to seek the authorization. Trial Tr. 68:6-69:6, Oct. 17, 2012. Approximately four minutes later Abrams returned and told Lazar that Miller would not authorize the pre-closing. *Id*. Lazar testified that he then left Hurwitz's office and went to his office to write and send a letter to Abrams confirming their conversation. *Id*.

Finally, Abrams testified that he arrived to Hurwitz's offices at 9:00 a.m. on the day of the closing. Trial Tr. 16:20-24, Oct. 18, 2012. He further testified that he does not remember what time Miller arrived to the office. Trial Tr. 16:25-17:18, Oct. 18, 2012. Abrams did not testify about what, if any, conversations he had on the morning of November 1, 2010 with Lazar.

In weighing the testimony about the sequence of events on the day of the closing, the Court finds Lazar's testimony to be more credible than that of Miller. Moreover, Lazar's

---

[6] Miller claims that he does not remember if he left Hurwitz's office at any point on the morning of November 1, 2010. Trial Tr. 134:10-19 Oct. 18, 2012.

account is more consistent with several undisputed facts.  For example, by 4:30 p.m. on November 1, 2010, Lazar, Gary Moss (Lazar's partner at his law firm), Binder, Binder's wife, a representative from First American (Plaintiffs' preferred title company), and a representative from Madison Abstract (Defendants' preferred title company), all appeared at Hurwitz's office to close on the JV Agreement.  Trial Tr. 71:25-77:13, Oct. 17, 2012.  Hurwitz and Abrams were also present.  Trial Tr. 21:3-21, Oct. 18, 2012; Trial Tr. 84:16─85:17, Oct. 22, 2012.  In addition, Binder brought with him that afternoon a cashier's check in the amount of $1,426,750, the exact amount of money necessary to close on the transaction.[7]  Trial Tr. 58:18-59:19 Oct. 18, 2012; Pls.' Ex. 41.  The evidence also established that Binder brought his checkbook with him and that his bank account had a balance of approximately $2.4 million dollars (after withdrawing the $1,426,750 for the cashier's check), more than enough funds to cover any additional charges that may have arisen.  Trial Tr. 59:20-60:18, Oct. 20, 2012; Pls.' Ex. 42.

The only person missing from the closing was Miller.  It is undisputed that Hurwitz called Miller after Binder's arrival that afternoon to inform him that Binder was at the office, had a check in the amount required to close, and was prepared to close. Trial Tr. 128:15-129:6, Oct. 18, 2012; Trial Tr. 84:16-85:17, Oct. 22, 2012.  In fact, Hurwitz went as far as to advise Miller to return to the office to close on the deal and to waive any perceived claims of default that Miller thought he might have.  Trial Tr. 84:16-85:17, Oct. 22, 2012.  Miller rejected this advice and informed Hurwitz that it was too late to close because Miller believed that Binder had already breached the JV Agreement.  Trial Tr. 128:15─129:6, Oct. 18, 2012.

The Court finds Miller's claim of not being able to return to the closing because of a prior engagement not compelling.  The Court might have been sympathetic to Miller's social

---

[7]    This amount represents the difference between the purchase price under the JV Agreement, the $700,000 deposit required under the JV Agreement, and the amount of the purchase money mortgage that Binder was entitled to elect under the terms of the JV Agreement.

engagement if he or his attorneys ever attempted to meaningfully communicate with Plaintiffs before November 1, 2010 to find a mutually agreeable closing time. The record, however, demonstrates that the Defendants failed to respond to Lazar's request to schedule the closing for 4:30 p.m. In addition, Defendants communicated with Tillow and his attorneys on several occasions to set the closing at a mutually agreeable time between those two parties, to the exclusion of Binder. Moreover, it is undisputed that the Tillow Contract did not close until about 3:00 p.m. on the closing date. The JV Agreement could not close until after the closing of the Tillow Contract. Binder appeared at Hurwitz's office ready, willing, and able to close a little more than an hour later. Under these circumstances, the Court rejects Miller's assertion that Binder defaulted under the JV Agreement.

### C. Plaintiffs are Entitled to Specific Performance

Given all the credible evidence, the Court finds that Binder was ready willing and able to perform under the JV Agreement as of November 1, 2010. *Eddy v. Davis*, 116 N.Y. 247, 251 (1889) (to hold a party in default, the other party is required to make a proper tender of performance, in accordance with all the terms of the agreement, at the closing). Accordingly, the Plaintiffs are entitled to specific performance of the JV Agreement. *See Petrello v. White*, 412 F. Supp. 2d 215, 231 (E.D.N.Y. 2006) *aff'd,* 344 F. App'x 651 (2d Cir. 2009) (to satisfy the legal standard for specific performance, party must show that he was "ready, willing, and able" to perform his duties under the contract); *Mercantile-Safe Deposit & Trust Co. v. Trans World Airlines, Inc.*, 771 F. Supp. 90 (S.D.N.Y. 1991); *Conn. Nat'l Bank v. Trans World Airlines, Inc.,* 762 F. Supp. 76 (S.D.N.Y. 1991) *New York Utility Co. v. Williamsburg Steam Laundry Co.*, 187

15

A.D. 110, 112 (1919) (to make a proper tender at closing, "the party must produce exactly what is called for by the contract and present it to the other party"). [8]

## CONCLUSION

For the reasons stated above, the Court finds that the Defendants breached the terms of JV Agreement. The Court further concludes that the Plaintiffs did not breach the JV Agreement but rather were ready, willing, and able to perform. Accordingly, the Court finds that Plaintiffs are entitled to specific performance of the JV Agreement. The Plaintiffs should submit an order consistent with this opinion.

Dated: New York, New York
September 4, 2013

                                                 */s/ Sean H. Lane*
                                                 UNITED STATES BANKRUPTCY JUDGE

---

[8] In addition to their other claims of breach, Plaintiffs also assert that Defendants anticipatorily breached the JV Agreement by refusing to grant Plaintiffs an adjournment of the closing date. Plaintiffs note that the JV Agreement is not a "time is of the essence" agreement and their request should have been honored. Trial Tr. 22:13─23:15; Pls.' Ex. 1. Given the Court's conclusions above, the Court does not decide Plaintiffs' allegations regarding the requested adjournment. The Court notes, however, that applicable case law appears to strongly support Plaintiffs request for a reasonable adjournment given the facts here. *See Grace v. Nappa*, 46 N.Y.2d 560, 389 N.E.2d 107 (1979) ("[O]rdinarily a vendor and vendee are allowed a reasonable time to perform their respective obligations pursuant to a real property contract, regardless of whether they specify a particular date for the closing . . . when there is a declaration that time is of the essence, each party must tender performance on law day unless the time for performance is extended by mutual agreement."); *ADC Orange, Inc. v. Coyote Acres, Inc.*, 7 N.Y.3d 484, 489-90, 857 N.E.2d 513, 516 (N.Y. 2006) (citing *Ballen v. Potter,* 251 N.Y. 224, 228, 167 N.E. 424 (N.Y. 1929)) ("The mere designation of a particular date upon which a thing is to be done does not result in making that date the essence of the contract. . . The most effective way for a party to make *time of the essence* is to say so in the contract.").